CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

OCT 25 2012

JULIA C. DUDLEY, CLERK
BY: /s/ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| ROSIALEE SHELTON | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 7:11-cv-00612 |
| | ) |
| v. | ) **MEMORANDUM OPINION** |
| | ) |
| THE PRUDENTIAL INSURANCE | ) By: Hon. Glen E. Conrad |
| COMPANY OF AMERICA | ) Chief United States District Judge |
| | ) |
| Defendant. | ) |

In this case, brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, the plaintiff claims that the defendant wrongfully terminated her long-term disability benefits issued under a group life insurance plan. Both parties filed motions for summary judgment. For the reasons set forth below, both parties' motions will be denied and the case will be remanded for further review of the plaintiff's eligibility for continued benefits.

## I.  Factual and Procedural Background

The plaintiff, Rosialee Shelton ("Shelton"), is a beneficiary of a life insurance policy (the "Plan") providing for long-term disability benefits issued through her employer, American Electric Power Service Corporation ("AEP"). The Plan is subject to ERISA. The Plan is funded by AEP, and the Prudential Life Insurance Company of America ("Prudential") serves as the named claims administrator with full discretionary authority over benefit determinations. (Administrative Record ("AR") at 1050.) If a claimant establishes that he or she is disabled under the Plan, Prudential provides a monthly benefit equal to 60% of a participant's base

monthly pay. The Plan requires that claimants apply for federal Social Security benefits, and then offsets any such benefits received against those issued under the Plan.

There are two different definitions of disability under the Plan:

> [During] the initial 24-month period from the date of disability, "disability" is defined as an illness or injury that requires the regular treatment of a duly qualified physician and that may reasonably be expected to prevent you from performing the material duties of your own occupation with AEP.
>
> After the first 24 months following the date of disability, "disability" is defined as an illness or injury that requires the regular treatment of a duly qualified physician and that may reasonably be expected to prevent you from performing the duties of any occupation for which you are reasonably qualified by your education, training and experience. So long as you continue to meet the requirements of this "two-year test," you will continue to be disabled.

(Id. at 996.)

The Plan provides that claimants must show they have been disabled for a period of 1,040 hours of regularly scheduled work before they can begin collecting benefits. (Id.) This means that benefits under the "own occupation" definition of disability can be paid for a maximum period of eighteen months. (Id. at 996.) All of the arguments advanced by the parties in this case involve only the "own occupation" definition of disability.

Shelton was employed by AEP as a "Trans Dispatcher IV." (Id. at 730.) Her job required her to work three or four twelve hour shifts per week. (Id.) Except for one or two days a month, Shelton worked indoors performing typical office functions. Her four main job categories were listed as: "desktop," "switch order checking," "filing etc.," and "field observations." (Id. at 733.) The field observations took place one to two days a month and called for driving to field sites, taking notes, and observing others. The field observations involved significant periods of standing, sitting, and walking. All of her in-office functions required frequent twisting and side-bending of the neck, and the switch order checking function

2

required occasional kneeling. (Id. at 734.) The job description issued by AEP labels the position as a "sedentary work position." (Id.) The job description also notes that AEP is willing to work with employees to make reasonable accommodations for those with difficulty performing their essential functions, and that employees may take breaks or shift positions as needed and allowed for by work demands. (Id.)

Shelton's last day of work was April 14, 2009. She filed a claim for long-term disability benefits based on severe neck, shoulder, upper and lower back, leg, and arm pain. In her claim, she noted that since a car accident in 1988, she had undergone multiple surgeries, including: two neck fusions, two back fusions, a laminectomy, and shoulder surgery. Based on an initial review completed by a physician hired by Prudential, Shelton was denied benefits on October 6, 2009. Prudential stated that Shelton had not submitted any records specifically outlining restrictions or limitations on her ability to work, and that based on her medical records and her ability to complete daily living activities she would be able to work full-time in a sedentary job.

Shelton appealed the denial on December 9, 2009. Through counsel, she submitted a letter from Dr. Cyrus Bakhit stating that Shelton suffered from significant chronic pain as a result of neck and back conditions. Dr. Bakhit stated that her pain "may intermittently become exacerbated. She is only able to groom herself and beyond that, prolonged sitting, standing, lifting, and bending, presents significant problems for her. Due to these significant impairments, the patient is considered totally disabled." (Id. at 585.) As part of its appellate review, Prudential submitted Shelton's file to Dr. John Ayres, an orthopedic surgeon. Dr. Ayres found functional impairments of the lumbar and cervical spine as well as the left upper extremity. He noted each of her past surgeries, and stated that she would be limited to standing for no more than two hours at a time and four hours total in an eight hour day, and should walk for no more

3

than one hour at a time and two hours in an eight hour day. Dr. Ayres also listed limitations on "crouching, squatting, kneeling, crawling, climbing or balancing or reaching at below or above left shoulder level, on flexing or extending the neck. . . . These activities should be done occasionally (only 5%-33% of the work shift)." (Id. at 576.) He found no limitation on sitting and concluded that Shelton was capable of working full-time at a sedentary work level. Prudential denied Shelton's appeal, finding that the results from its medical review acknowledged certain limitations and restrictions, but that those restrictions were in line with the physical demands of a sedentary work job such as a Trans Dispatcher IV. (Id. at 578.)

Shelton then filed a second appeal on March 9, 2010. She submitted another letter from Dr. Bakhit, in which he stated that Shelton suffered from multiple pain issues related to her neck and back and had "difficulty with activities, such as prolonged sitting, standing, and walking, bending, stooping, and lifting, which prevent her to participate [sic] in any employment." (Id. at 561.) Prudential again submitted the file to an independent peer review physician, this time a Dr. Griver, who found that Shelton suffered from functional impairments and should be limited to sitting for no more than six hours out of an eight hour period, with breaks available every two hours for change of position. Dr. Griver also recommended a limitation on standing and walking of 30 minutes at a time with no more than two and a half hours total during an eight-hour day. (Id. at 172-79.) Dr. Griver noted that "[t]hese restrictions would be permanent as the cervical and lumbar fusions and the cervical and lumbar degenerative changes are permanent conditions. These opinions are supported by the medical summary as noted above, specifically the listed MRI and CT scan results as well as the postoperative notes from Drs. Farmer and Torres [sic]." (Id. at 176-77.)

Prudential also arranged for an independent medical examination with Dr. Samuel Thampi for July 22, 2010. He diagnosed Shelton with "post laminectomy syndrome of the cervical spine and post laminectomy syndrome of the lumbar spine." (Id. at 538.) His examination noted Shelton's complaints of neck and lower back pain, as well as "decreased strength 4/5 in the hip flexor muscles on the right and decreased sensory function of right L3 . . . . Straight leg raise test was positive to 90 degrees on the right side." (Id. at 535.) He concluded that Shelton would be limited to sitting for 10 consecutive minutes and a total sitting time of four hours in an eight-hour day. He limited her standing to five continuous minutes with a one-hour total for the day. He also stated that her ability to grip, grasp, hold, and pinch with her left arm was limited to an "occasional" basis. (Id. at 537-38.) Dr. Thampi wrote that "the duration of such restrictions will be for the next six months at which time she will need a re-evaluation after ongoing pain management." (Id. at 538-39.)

On July 29, 2010, based on Dr. Griver's and Dr. Thampi's reviews, Prudential granted Shelton's second appeal and approved long-term disability benefits effective October 10, 2009. (Id. at 916-17.) The award letter noted that her claim would be reviewed again in six months to determine whether she remained disabled.

In November 2010, Shelton submitted an updated Activities of Daily Living Questionnaire in which she stated, "I cannot sit or stand for extended amounts of time. I also need the ability to lay down at any time or for extended amounts of time due to my back. I have trouble using my neck to look up." (Id. at 458-62.) She reported that she was able to drive, prepare meals, wash dishes, take out the trash, and other typical household chores. (Id. at 462.)

In December of 2010, Prudential began a new review of Shelton's files, noting that she had recently undergone surgeries on her left elbow and shoulder. Prudential requested updated

5

medical records from Shelton's physicians, including the doctors who performed those surgeries, Dr. Torre and Dr. Farmer, respectively. Dr. Torre submitted a Medical Consultant Review ("MCR") on February 4, 2011 through a physician's assistant in his office. The form listed no restrictions other than a limit on lifting more than 20 pounds. Specifically, it noted Shelton was not medically restricted from sitting, standing, or walking, and had no upper extremity restrictions whatsoever. (Id. at 369-70.) Dr. Farmer's MCR similarly stated that Shelton was not restricted from sitting, standing, or walking. Dr. Farmer did note some restrictions on the use of Shelton's upper extremities and on crouching and stooping.

Dr. Bakhit also submitted a MCR in which he stated that Shelton could not sit, stand, or walk for longer than an hour, even when given short breaks for change of position. (Id. at 251-52.) Shelton's main orthopedist, Dr. Jonathan Carmouche, did not complete a MCR but submitted notes from his examinations of Shelton. His notes from an August 24, 2010 visit indicate that he had reviewed her imaging studies and found that "L3-4 had poor morphologic appearance," and there was concordant pain at L3-4. In his recommendation, he noted that he was not sure that "stabilization and decompression at L3-4" would be enough, and that if Shelton's symptoms persisted, he would revisit whether to recommend a multiple level fusion. (Id. at 264.) The most recent visit with Dr. Carmouche appears to have been on November 2, 2010, and the notes from that exam state that Shelton continued to complain of lower back pain and experienced "minimal, moderate relief with recommended treatments." (Id. at 260-61.) Based on the exam, Dr. Carmouche increased Shelton's pain medication level but recommended allowing her more time to recover from her recent discectomy before trying another surgical procedure. (Id.)

6

On March 11, 2011, Prudential terminated Shelton's long-term disability benefits. (Id. at 900.) Prudential's letter noted that it had reviewed all the additional information submitted since the grant of benefits in July 2010, and had determined that Shelton was no longer disabled from performing her sedentary job. (Id.) With respect to Dr. Bakhit's opinion that Shelton was unable to sit for more than an hour during the course of a single day, Prudential wrote that "[i]t is not clear why you have [such limited] capacity . . . . There are no updated office notes included with [Dr. Bakhit's] capacity questionnaire." (Id.)

Shelton appealed Prudential's decision on March 17, 2011. At Prudential's request, Dr. Andrea Zotovas conducted a review of Shelton's file as part of the appeal process. After reviewing Shelton's submitted medical records, including MRI and CT scan results from 2009 and 2010, Dr. Zotovas found that Shelton had some functional impairments, including inability to twist, bend, or stoop, with only occasional crouching, squatting, kneeling, and crawling. Dr. Zotovas also indicated that in her opinion, Shelton had no restrictions on sitting. Dr. Zotovas further stated, however, that Shelton could stand for only two hours at a time and for a total of four hours in an eight hour day, and could walk for only one hour at a time and for a total of two hours in an eight hour day. (Id. at 72.) With respect to Dr. Bakhit's claims that Shelton suffered significantly greater limitations, Dr. Zotovas wrote that Dr. Bakhit had not included any objective medical results in support of his stated restrictions.

Shelton's first appeal was denied following Dr. Zotovas' report. Shelton filed a second level appeal and Prudential submitted her records to Dr. Saul Weingarten, who filed a report on August 9, 2011. Dr. Weingarten found that the multiple surgical procedures on Shelton's spine and shoulder warranted some minor functional limitations. He found that Shelton could lift to shoulder level 10 pounds frequently and 15 pounds occasionally, and that she should not bend,

7

twist, kneel, or squat. (Id. at 29.) He found no restrictions with respect to sitting, so long as she could take short breaks for change of position, but that Shelton was restricted to two hours of consecutive standing with half hour breaks. (Id.) Dr. Weingarten discussed Dr. Bakhit's suggested limitations but, like Dr. Zotovas, dismissed them as unsubstantiated by objective medical records. (Id. at 30.) Dr. Weingarten wrote that the more restrictive limitations were probably the result of Shelton self-reporting levels of pain that were inconsistent with her medical records.

Following receipt of Dr. Weingarten's report, Prudential denied Shelton's final appeal on August 26, 2011. (Id. at 879.) Prudential's letter noted that Shelton had undergone numerous surgeries but that her examinations did not reveal significant abnormalities, and that her subjective complaints of pain were not supported by diagnostic evidence. (Id.) Prudential found that although a number of doctors had suggested some functional limitations, these "would not prevent Ms. Shelton from performing [the] material and substantial duties of her own occupation." (Id.) Shelton then filed this civil action.

## II. Discussion

### A. Standard of Review

A court reviews a plan administrator's decision in making eligibility determinations for beneficiaries on an abuse of discretion standard. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Williams v. Metropolitan Life Ins. Co., 609 F.3d 622, 629-30 (4th Cir. 2010). "[A] court will not disturb the administrator's decision as long as it is objectively reasonable, even if the court would have reached a different conclusion." Winebarger v. Liberty Life Assurance Co. of Boston, 571 F. Supp. 2d 719, 722 (W.D. Va. 2008) (citing Doe v. Group Hospitalization & Med Servs., 3 F.3d 80, 85 (4th Cir. 1993)). "[A]n administrator's decision is

reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 322 (4th Cir. 2008). Substantial evidence is evidence that "a reasoning mind would accept as sufficient to support a particular conclusion [and] consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." LeFebre v. Westinghouse Elec. Corp., 747 F.2d 197, 208 (4th Cir. 1984).

The Fourth Circuit has "identified eight nonexclusive factors that a court may consider" in determining whether a plan administrator abused its discretion in denying a benefits claim. Those factors are:

> (1) The language of the plan; (2) The purpose and goals of the plan; (3) The adequacy of the materials considered to make the decision and the degree to which they support it; (4) Whether the decision-making process was reasoned and principled; (5) Whether the decision comports with other provisions in the plan and with earlier interpretations of the plan; (6) Whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) Any external standard relevant to the exercise of discretion; and (8) The Administrator's motives or any conflicts of interest it may have.

Champion v. Black & Decker (U.S.), Inc., 550 F.3d 353, 358 (4th Cir. 2008) (quoting Booth, 201 F.3d at 342-43). When the plan administrator merely oversees the operation of the plan and makes eligibility determinations, but does not fund the plan, the conflict of interest factor is not implicated. Metro Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 2348-50 (2008). In this case, the plan is funded entirely by AEP, not Prudential, and so there is no potential conflict of interest.

Finally, it is the plaintiff's burden to show that he or she is disabled under the benefits plan. Elliot v. Sara Lee Corp., 190 F.3d 601, 605 (4th Cir. 1999) ("The burden of proving the disability is on the employee."); see also Thomas v. Liberty Life Ass. Co. of Boston, 226 F. Supp. 2d 735, 744 (D. Md. 2002) ("Under [the plan], it is the claimant's burden to present competent proof of his continued disability.").

9

## B. Analysis

Having laid out the relevant medical evidence and the standard of review this court must employ in evaluating Shelton's claim, the court now considers whether Prudential abused its discretion in terminating Shelton's benefits under the "own occupation" definition of disability. Shelton argues that Prudential failed to properly consider the actual job requirements of the Trans Dispatcher IV position. When considering the "own occupation" standard for disability plans, courts should begin by reviewing the employee's job description. See Greene v. Reliance Standard Life Ins. Co., 2004 WL 2634416, *2 (W.D. Va. Oct. 26, 2004) ("When making an eligibility determination under an ERISA covered policy, a plan fiduciary must use an 'objectively reasonable' description of the insured's occupation which includes duties comparable to those actually performed by the insured."). Here, AEP's job description states that the Trans Dispatcher IV position is a "sedentary position based on [the] Dictionary of Occupational Title's Physical Demand Characteristics of Work." (Id. at 732). The job description indicates that roughly eighty percent of the work performed is typical office work that would ordinarily be completed while seated. (Id.)

Shelton's quarrel with Prudential's characterization of the position is that Prudential ignores the one or two field observations that dispatchers are expected to perform each month. The field observations include driving to job sites and then spending the remainder of the day standing, sitting, and walking, while performing various tasks around the site. The job description lists the time spent standing and walking during the observation as "frequent," which is described as between 34-66% of the total time performing the task. (Id. at 733.) In a twelve hour day, even accounting for driving time, this could potentially amount to as much as seven hours of walking per shift.

10

Prudential never specifically addressed why it believed Shelton would be able to perform this part of her job under the restrictions imposed by the doctors who examined her files—including two, Drs. Weingarten and Zotovas, who were hired by Prudential. Shelton's main treating physician, Dr. Bakhit, repeatedly indicated that he did not believe Shelton could perform any of her essential job functions, much less the standing and walking associated with the field observations. Additionally, Dr. Griver's and Dr. Thampi's limitations on standing were more restrictive than the physical demands required by the position. While it is true that Dr. Farmer and Dr. Torre both stated that Shelton had no restrictions on sitting or standing, they primarily treated Shelton for her shoulder and elbow conditions, and would have had less familiarity with the back issues that were at the heart of Shelton's alleged disability.

It is also true that there is no "treating physician rule" in ERISA cases, and that plan administrators are not required to "accord special weight to the opinions of a claimant's physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). However, two of the doctors retained by Prudential to evaluate Shelton's appeals listed restrictions on standing and walking that are at odds with the field observation requirements. As addressed above, Dr. Zotovas' report indicates that Shelton could stand for only two hours at a time and for a total of four hours in an eight hour day, and could walk for only one hour at a time and for a total of two hours in an eight hour day. (AR at 72.) Likewise, Dr. Weingarten stated that Shelton was limited to two hours of standing at a time, with the need for half hour breaks in between each period. (Id. at 29.) Even crediting Prudential's doctors over Shelton's, it does not appear that Shelton would be able to perform the requirements of the field observations as set forth in the job description.

11

Prudential's letters to Shelton did not adequately explain why it believed Shelton was unable to perform the field observations. Prudential's final letter to Shelton denying her second appeal addresses the sedentary aspects of her job, but makes no mention of the walking and standing requirements of the field observations. (AR at 881.) It does not, however, address the ambulatory requirements of the position, perhaps because even the doctors hired by Prudential imposed limitations on Shelton's capacities that were more restrictive than what the job demanded.

After review of the administrative record and the parties' briefs, the court finds that Shelton was disabled under the Plan's "own occupation" definition of disability based on her inability to engage in her job as actually performed. The court further determines that Prudential's failure to consider the ambulatory requirements of the position, as well as its failure to inform Shelton why the medical opinions limiting her capacity to stand and walk would not prevent her from performing the field observations, amounted to an abuse of its discretion as claims administrator. Having deciding that Shelton was disabled from her regular occupation based on the field observation requirement, the court finds it unnecessary to go into any greater analysis of Prudential's determinations regarding Shelton's ability to perform the rest of her job functions, or her status under the more rigorous "any occupation" definition of disability. It does, however, become necessary to address the proper remedy for the court to implement.

This case is somewhat unusual in that the claimant's arguments before the court address only whether she is disabled under the "own occupation" standard, even though it is undisputed that the claimant has received the maximum amount of benefits eligible to her under the 24-month period applicable to that definition. As previously stated, when the 1,040 hour elimination period is considered, the longest a claimant can receive benefits under the "own

12

occupation" standard is eighteen months. Prudential's initial grant of benefits to Shelton on July 29, 2010 retroactively awarded benefits effective October 10, 2009. Prudential's decision to terminate Shelton's benefits was made on March 11, 2011, but the termination was not effective until April 10, 2011—exactly eighteen months from the date benefits were first granted. As a result, Shelton is not entitled to a retroactive award of benefits based on the "own occupation" definition of disability.

Instead, the proper course is for the court to remand the case to the plan administrator for a determination of Shelton's eligibility under the "any occupation" definition. It is clear from Prudential's denial letters that Prudential only considered Shelton's claim under the "own occupation" standard of disability. (AR at 881) (noting that Shelton "retain[ed] the functional capacity to perform sedentary work activities as required for her regular occupation as a Trans Dispatcher IV"). As such, Prudential has not yet considered whether Shelton is eligible for benefits under the "any occupation" standard. In such a case, the correct course of action is to remand the claimant's application to the plan administrator for a decision applying the appropriate standard. See Pakovich v. Broadspire Services, Inc., 535 F.3d 601, 606-07 (7th Cir. 2008) (holding that because "the Plan Administrator did not issue any decision on [the claimant's] eligibility for disability benefits under the 'any occupation' standard," it left the district court with nothing to review, and remand was appropriate); see also Seman v. FMC Corp. Retirement Plan for Hourly Employees, 334 F.3d 728, 733 (8th Cir. 2003) ("When a plan administrator fails to render any decision whatsoever on a participant's application for benefits, it leaves the courts with nothing to review under any standard of review, so the matter must be sent back to the administrator for a decision."); Lavino v. Metropolitan Life Ins. Co., No CV 08-2910, 2010 WL 234817, *13 (C.D. Cal. Jan. 13, 2010) ("[B]ecause MetLife has never had an

opportunity to decide Plaintiff's case under the 'any occupation' standard, Plaintiff's request for 'any occupation' benefits is not an appropriate subject of this action. This Court is not the proper forum to submit an 'any occupation' claim in the first instance. Remand is proper with respect to the 'any occupation' standard."). Accordingly, the court will remand Shelton's application to Prudential for a determination of her eligibility status under the "any occupation" definition of disability.

### III. Conclusion

For the reasons stated above, the court concludes that Prudential abused its discretion in terminating Shelton's benefits under the "own occupation" definition. The parties' motions for summary judgment will be denied, and the case will be remanded to Prudential for further administrative proceedings. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 24th day of October, 2012.

*/s/ Glen Conrad*

Chief United States District Judge

14

Case 7:11-cv-00612-GEC   Document 24   Filed 10/25/12   Page 14 of 14   Pageid#: 184